THE NORTHERN TRUST COMPANY, Successor Guardian of the Estate of Shelby Anderson Moran, a Disabled Person, Plaintiff-Appellee and Cross-Appellant, v. THE UPJOHN COMPANY, Defendant-Appellant and Cross-Appellee (John J. Barton *et al.*, Defendants-Appellants).

First District (5th Division)   Nos. 1—89—2165, 1—89—2244, 1—89—2357 cons.

Opinion filed April 26, 1991.

Stephen R. Swofford, Carlton D. Fisher, and Bruce L. Carmen, all of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, and Sedgwick, Detert, Moran & Arnold (James T. Conlon, of counsel), for appellant Upjohn Company.

Neil K. Quinn and Randall C. Monroe, both of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Scott O. Reed, of counsel), for appellant John J. Barton.

William V. Johnson and Susan Marzec Hannigan, both of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellant Illinois Masonic Medical Center.

James H. Canel, Ltd., of Chicago (James H. Canel and Patricia N. Hale, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

This opinion addresses the consolidated appeals brought by the Upjohn Company (Upjohn) (No. 1—89—2165); John J. Barton, M.D. (Dr. Barton) (No. 1—89—2357); and the Illinois Masonic Medical Center (IMMC or the hospital) (No. 1—89—2244), as well as the cross-appeal brought by the Northern Trust Company (Northern Trust), the successor guardian of the estate of Shelby Anderson Moran (Moran), a disabled person. The facts of the case are as follows.

At about 4 p.m. on January 24, 1978, Moran entered IMMC to have her pregnancy aborted. Although Moran had a history of high blood pressure (hypertension) and was taking medication to control this, her blood pressure upon entering the hospital that day was normal and she was observed, upon initial interview by Nurse Ping, to be in generally good health, although she was somewhat overweight.

After Moran was prepared by Nurse Ping and an IV started, Dr. Barton came to the room to perform the procedure. The method chosen to accomplish the second-trimester pregnancy interruption was intrauterine administration of the drug Prostiglandin F2 Alpha (Prostin), which was manufactured and distributed by Upjohn.

Instillation of the Prostin began at about 4:20 p.m. and was completed at about 4:25 p.m. Dr. Barton then left the room to go to the nurses' station to write in Moran's chart. Initially, Moran suffered some of the side effects typically associated with the drug, including nausea, vomiting, cough, and irregular pulse rate. However, by 4:30 p.m. her blood pressure had elevated dramatically to 230 over 75. Dr. Barton was called back into Moran's room and notified of this change. At about 4:35 p.m., Dr. Barton returned to Moran's room to check on her. After making a physical assessment, he decided that Moran was having a mild reaction to the Prostin and instructed Nurse Ping to continue monitoring her closely. He then left the room.

At about 4:40 p.m. Moran's blood pressure seemed to have improved, but her pulse weakened, she became cyanotic, and she experienced shortness of breath. For this reason Nurse Ping started administering oxygen to Moran and attempted to notify Dr. Barton of this fact.

With the administration of oxygen, Moran's cyanosis did not improve, but she was sitting up and talking and appeared less anxious. Then, at about 4:55 p.m., Moran's blood pressure dropped very low

and she "didn't look the same" to Nurse Ping. Dr. Barton was paged and, when he did not respond, Dr. Garbaciak, a resident obstetrician/gynecologist at the hospital, was called to check her. Dr. Garbaciak responded immediately and as he entered the room Moran suffered a cardiac arrest.

Cardio-pulmonary resuscitation was begun and a "code blue" was called. The "code team" arrived immediately and Moran was ultimately resuscitated. However, because of the cardiac arrest, Moran sustained brain injury, which apparently involves permanent memory loss, disorientation, inability to understand abstract concepts, and difficulty in performing normal daily activities. There is some dispute over the exact nature of the brain injury. There is evidence that it may be organic in nature, i.e., an irreversible physical condition resulting from oxygen deprivation to the brain. However, there was also some evidence that it is psychological in nature, i.e., Moran may suffer from a psychiatric condition known as "conversion reaction," brought on by deep depression. It is also possible that Moran's non-communicative condition has components of both organic and psychiatric injury. In any event, Moran has required residential care in a nursing home environment since her release from IMMC.

In January 1980, Northern Trust filed a complaint in the circuit court of Cook County naming Upjohn, Dr. Barton and IMMC as defendants. Dr. Barton and IMMC were charged with medical malpractice, while Upjohn was charged with negligence and product liability. After years of discovery and pretrial activity, the cause proceeded to trial before a jury in 1989. The trial lasted eight weeks, after which the jury deliberated several days. They returned a general verdict in plaintiff's favor and against all defendants, jointly and severally, in the amount of $9,510,301. On April 14, 1989, the trial court entered judgment on the verdict. Post-trial motions were denied. All three defendants filed timely appeals and plaintiff cross-appealed. This court consolidated the appeals in an order dated October 26, 1989, and oral argument was held March 12, 1991.

Initially, this court notes that on February 8, 1991, this court, on its own motion, entered an order that the parties show cause why the appeals should not be dismissed as nonfinal. This is because the trial court, in the order being appealed, retained jurisdiction to consider costs and fees and did not include the language that there was "no just reason for delaying enforcement or appeal," as set forth in Rule 304(a) (107 Ill. 2d R. 304(a)). The order stated:

> "Further ordered that this court shall retain jurisdiction to approve Plaintiff's costs and fees pursuant to the local rules of

the Circuit Court of Cook County, but that, in no way is such retention of jurisdiction intended to delay the force and effect of the judgment portion of this order."

■ It is a reviewing court's duty to determine whether it has jurisdiction to entertain an appeal, even if none of the parties raise the issue. (See *In re Custody of D.A.* (1990), 201 Ill. App. 3d 810, 558 N.E.2d 1355; *Illinois State Toll Highway Authority v. Gary-Wheaton Bank* (1990), 203 Ill. App. 3d 672, 561 N.E.2d 377.) Consequently, before considering the merits of the appeals before us, we shall first address the question of whether this court has jurisdiction over them.

■ Recent case law has defined a request for attorney fees, whether pursuant to statute (see *Marsh v. Evangelical Covenant Church* (1990), 138 Ill. 2d 458, 563 N.E.2d 459 (attorney fees sought as a sanction under section 2—611 of the Civil Practice Law)), or pursuant to a contract provision (see *Mars v. Priester* (1990), 205 Ill. App. 3d 1060, 563 N.E.2d 977 (discretionary award of attorney fees requested under terms of contract)), as a "claim" within the meaning of Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)). Consequently, a trial court's retention of jurisdiction to hear such a claim makes any other judgment in the case nonfinal and nonappealable unless the language set forth in Rule 304(a), that no just reason to delay enforcement or appeal, has been inserted.

In the present case the trial court retained jurisdiction to consider the matter of attorney fees. However, it appears that the issue of attorney fees in this case was not a claim for fees made against the defendants. In this case the trial court retained jurisdiction to approve the proper distribution of the judgment award to cover plaintiff's cost of litigation, including attorney fees. Such court intervention in the distribution of the judgment award is necessitated by local Circuit Court Rule 6.4, concerning the disposition of pending cases involving minors or disabled persons.

■ For this reason we do not believe that the issue of attorney fees in this case is a "claim for relief" within the meaning of Rule 304(a). It is not a matter involved in the action nor does it represent a possible liability of the defendants. Consequently, we find that the judgment entered by the trial court was final despite the retention of jurisdiction to consider plaintiff's attorney fees and this court has jurisdiction to proceed with the merits of the appeals.

UPJOHN APPEAL

Upjohn raises six issues on appeal:

1. Whether the trial court erred by allowing plaintiff to place into evidence the 1981 package insert for Prostin.

2. Whether Upjohn was entitled to a directed verdict or judgment notwithstanding the verdict (JNOV) because plaintiff presented no expert testimony to establish the inadequacy of the warnings included in the package insert for Prostin in 1978.

3. Whether the verdict was against the manifest weight of the evidence because plaintiff failed to establish that the alleged failure to warn was the proximate cause of plaintiff's injury.

4. Whether the jury was improperly instructed on the matter of proximate cause.

5. Whether the trial court erroneously admitted certain testimony by Dr. Barton.

6. Whether remittitur or a new trial on damages should be granted because the amount of the verdict was unsupported by the evidence.

Initially we note that, prior to trial, Upjohn filed a motion for summary judgment. At trial, at the close of plaintiff's case, Upjohn moved for a directed verdict and in a post-trial motion Upjohn moved for judgment notwithstanding the verdict. In each instance, it was Upjohn's contention that expert testimony was necessary to establish its liability and that because no expert had been presented by plaintiff to establish the inadequacy of the warning provided in the Prostin package insert, it was entitled to judgment in its favor. We agree.

There is no case law in Illinois which addresses the issue of whether expert testimony should be required in actions against drug manufacturers alleging a failure to adequately warn. There are, however, cases in other jurisdictions which establish the need for expert testimony in negligence and/or product liability actions involving prescription drugs, premised on the drug manufacturer's failure to warn. (See *Carlsen v. Javurek* (8th Cir. 1975), 526 F.2d 202; *Hill v. Squibb & Sons, E.R.* (1979), 181 Mont. 199, 592 P.2d 1383; *Dion v. Graduate Hospital of University of Pennsylvania* (1987), 360 Pa. Super. 416, 520 A.2d 876; *Upjohn Company v. MacMurdo* (Fla. 1990), 562 So. 2d 680.) These courts have found that such a requirement is the logical extension of the fact that a prescription drug manufacturer's duty to warn is directed to the prescribing physician. For that reason, only a physician or someone with specialized knowledge would be qualified to determine whether the warning was inadequate. (See *Hill v. Squibb & Sons, E.R.*, 181 Mont. at 206, 592 P.2d at 1388.) These courts have also held that requiring expert testimony in failure-to-warn cases in-

volving prescription drugs is analogous to the expert testimony requirement in medical malpractice actions.

■■■ We observe that in Illinois it has already been determined that when dealing with prescription drugs, where the warning is being communicated to a physician who acts as a learned intermediary, the adequacy of the warning must be judged by whether it sufficiently apprises the prescribing physician of the risk associated with the use of the drug. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 513 N.E.2d 387; *Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E.2d 1214.) It is also necessary in Illinois to present expert testimony in medical malpractice actions. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279.) Based upon this established Illinois law, we now adopt the rationale of the courts in the other jurisdictions cited above and hereby hold that, by logical extension, expert testimony shall be necessary and proper in a case, such as the one at bar, where a drug manufacturer's liability for a prescription drug is based upon its failure to provide adequate warnings. We note, however, that our decision, as in the cases cited above, is limited to those instances where the inadequacy of the warning is not so obvious that a lay person could not readily understand the insufficiency of the warning. (See *Dion v. Graduate Hospital of University of Pennsylvania*, 360 Pa. Super. at 426, 520 A.2d at 881 (expert testimony requirement limited to those cases in which the meaning of the warning eludes the comprehension of the ordinary lay person).) Consequently, we must now consider whether expert testimony was required in the present case or whether the alleged failure to warn was of a type that would allow a jury to reach an intelligent conclusion about the adequacy of the warning without the aid of an expert's specialized knowledge.

In the present case, plaintiff amended its complaint a number of times. However, with respect to the action against Upjohn, the theories of recovery that were ultimately submitted to the jury were (1) that Upjohn was negligent in the marketing and selling of Prostin because (a) Upjohn failed to inform physicians that cardiac arrest was associated with the use of Prostin, and (b) Upjohn failed to inform physicians that possible adverse reactions were not transient; and (2) that Prostin, at the time it left Upjohn's control, was in an unreasonably dangerous condition in that (a) its product labeling insert did not warn physicians that cardiac arrest was associated with the use of Prostin, (b) the product insert informed physicians that adverse reactions were transient, (c) the therapeutic profile did not warn physi-

cians that cardiac arrest was associated with the use of Prostin, and (d) the therapeutic profile informed physicians that adverse reactions were transient.

■ The jury was also instructed that it could consider whether Upjohn violated any statute, regulation or ordinance when deciding whether it was negligent and/or manufactured an unreasonably dangerous product. The statute being referred to, and which was quoted in pertinent part in the instructions to the jury, was entitled "Misbranded drugs and devices." (21 U.S.C. §§352(a), (f), (j), (n) (1988).) The statute provides that a drug would be considered misbranded if its labeling was found to be false or misleading or if it failed to contain "adequate directions for use." The regulation referred to and quoted in the jury instructions indicates that the labeling of a drug or device would be deemed misleading if it failed to reveal facts that were "material in light of other representations made *** or with respect to consequences which may result from use." The regulation also indicates that changes in labeling, advertising or warnings concerning a drug's contraindication or side effects should be "placed into effect at the earliest possible time." 21 C.F.R. §§1.3(a)(1), (a)(2), 314.8(a), (b), (d), (e), (l) (1990).

At trial plaintiff attempted to show that cardiac arrest and/or death were possible side effects associated with the drug Prostin, that Upjohn was aware or should have been aware of the association between cardiac arrest and the use of its drug Prostin, but that Upjohn failed to include this possible side effect in its package insert, making the drug unreasonably unsafe or "defective." To this end, plaintiff presented testimony and other evidence that prior to 1978 there were a number of cases[1] known to Upjohn where cardiac arrest and/or

---

[1]Prostin was approved by the FDA and placed on the market in 1973. After obtaining FDA approval Prostin was tested in clinical trials with over 7,300 patients, none of whom experienced a cardiac arrest.

At trial plaintiff presented evidence that in May 1976 a paper was presented at the 24th Annual Meeting of the College of Obstetricians and Gynecologists wherein four incidents of cardiac arrest and death were indicated to be "associated" with Prostin. However, the paper also indicated that Prostin "may have had only tangential association with the chain of events leading to any of the deaths." The total number of instances of cardiac arrest which may have occurred in conjunction with the use of Prostin between 1973 and 1978 is unclear. It is also unclear whether Upjohn was made aware, either through doctor experience reports or other communications, of every instance of cardiac arrest which occurred. However, from the evidence at trial it appears that Upjohn was aware of as many as nine instances where cardiac arrest and/or death occurred during second-trimester abortions in which Prostin was used.

death had occurred during second-trimester abortions in which the drug Prostin had been utilized.

Upjohn, however, disputed the contention that its knowledge that instances of cardiac arrest had occurred in correlation with the use of Prostin was equivalent to knowledge that cardiac arrest was a "side effect" of Prostin so that it was obligated to list it as an adverse reaction in its package insert. Upjohn also argued that the omission of the term "cardiac arrest" from the list of adverse reactions in the package insert did not make the warning ineffective or inadequate.

When a plaintiff attempts to prove that a drug manufacturer failed to adequately warn, he must first demonstrate that there was a duty to warn. (*Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E.2d 1214.) Thus, in this case it was plaintiff's initial burden to show that cardiac arrest was, in fact, a reaction caused by the use of the drug Prostin. (See *Mahr*, 72 Ill. App. 3d at 561.) Additionally, following such a showing, plaintiff was required to plead and prove that Upjohn knew or should have known that cardiac arrest was a possible reaction caused by Prostin, but failed to warn of that fact. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194.) Finally, plaintiff was required to show that the omission of such information made the warning inadequate and the drug "defective" and that this defect was the proximate cause of plaintiff's injuries. Of course, it should be recalled that because the case involves prescription drugs where the warning is being communicated to a physician who acts as a learned intermediary, the duty to warn is directed to physicians and the adequacy of the warning must be judged by whether it sufficiently apprises physicians of the risks associated with the use of the drug. *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 513 N.E.2d 387; *Mahr v. G.D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E.2d 1214.

This court finds that the question of whether Upjohn's knowledge of reported cases of cardiac arrest was tantamount to knowledge of an "association" between the drug and cardiac arrest which obligated it to include cardiac arrest as a possible side effect was a complex question which required expert testimony. To the extent that Dr. Ischler, an employee of Upjohn, was an expert on this subject, his testimony failed to establish Upjohn's breach of duty. Dr. Ischler's testimony indicated that there was no magic formula used for deciding when an adverse reaction must be included in a warning. Dr. Ischler also testified that deciding what information concerning reactions to a drug should be reported depends on a "medical interpretation of the events." Even though Upjohn "could have" included cardiac arrest in its warning,

this is not the same as saying that Upjohn breached its duty because it omitted cardiac arrest from the list of reactions.

■■■ Both Dr. Lesch, a cardiologist presented by Upjohn, and Dr. King, an obstetrician/gynecologist who testified on behalf of Dr. Barton, seemed to indicate that the evidence regarding Moran, as well as the drug experience reports and other evidence admitted at trial with regard to Prostin, might indicate that cardiac arrest was not, itself, the adverse reaction as much as the result of other adverse reactions such as vomiting, bronchospasm, convulsion or heart block, which were listed by Upjohn as adverse reactions associated with the drug. Also, there was evidence that, despite the fact that cardiac arrest occurred after the administration of Prostin, the presence of preexisting conditions in some of the patients who experienced cardiac arrest had to be taken into consideration since they could have been implicated as the causal factor in bringing about the cardiac arrest. In any event, it seems clear that the link between Prostin and cardiac arrest was not so apparent that expert testimony was not necessary to establish that a duty was imposed upon Upjohn to include cardiac arrest in the warnings based upon its knowledge that a small number of cardiac arrests had occurred in conjunction with the use of Prostin.

■■■ We realize that plaintiff introduced the 1981 insert, which had been amended to include information concerning the incidence of cardiac arrest, to establish the link between Prostin and cardiac arrest. However, we find this, too, was error. Although the question of whether post-occurrence warnings are admissible in failure to warn product liability cases involving prescription drugs is one of first impression in this State, we find persuasive other authorities which have contemplated the matter. (*Werner v. Upjohn Co.* (4th Cir. 1980), 628 F.2d 848; *DeLuryea v. Winthrop Laboratories, A Division of Sterling Drug, Inc.* (8th Cir. 1983), 697 F.2d 222; *Smith v. E.R. Squibb & Son* (1976), 69 Mich. App. 375, 245 N.W.2d 52, *aff'd* (1979), 405 Mich. 79, 273 N.W.2d 476.) These courts rejected the notion that post-occurrence warnings were admissible, finding them to be inappropriate. We agree.

In this case the salient question was whether Upjohn knew, prior to 1978, that cardiac arrest was associated with the use of the drug Prostin. Consequently, what Upjohn knew or included in its warnings after 1978 was irrelevant and only served to confuse and prejudice the jury against Upjohn. See, *e.g., Gaenzele v. B.E. Wallace Products Corp.* (1976), 39 Ill. App. 3d 93, 350 N.E.2d 371.

■■■ Finally, even if we were to assume that the evidence that was presented at trial was sufficient to advise the typical lay person that there existed a correlation between the drug Prostin and cardiac ar-

rest sufficient to impose upon Upjohn a duty to warn, there is still the question of whether Upjohn abrogated its duty, *i.e.*, whether it was enough for plaintiff to present evidence that Upjohn did not inform physicians, via the product insert or other means, that cardiac arrest was a possible side effect of the use of the drug Prostin. This question, too, required expert testimony since we believe that the real issue was not whether the term "cardiac arrest" was listed among the side effects, but rather, whether the package insert and other materials designed to warn physicians of the possible risks associated with the drug were adequate to advise *a physician* of the potential dangers that were inherent in the use of the product, despite the fact that cardiac arrest was not listed *specifically* as a possible side effect of the drug.

In the 1976 package insert included with the drug Prostin, the following information was provided:

"INDICATIONS

Prostin F2 Alpha (dinoprost tromethamine) is indicated for terminating second trimester pregnancy by the intra-amniotic administration of the drug.

In a group of 229 patients, using the recommended dosage, 86.0% aborted completed, 12.2% incompletely and 1.8% failed to abort.

CONTRAINDICATIONS

1. Hypersentivity [*sic*] to Prostin F2 aplha [*sic*] (dinoprost tromethamine).

2. Acute pelvic inflammatory disease.

WARNINGS

Prostin F2 alpha as with other potent oxytocic agents, should be used ONLY with strict adherence to recommended dosages, by medically trained personnel in hospital surroundings which provide immediately-available intensive care and acute surgical facilities.

Evidence from some animal studies has suggested that certain prostiglandins may have some teratogenic potential. Therefore, any failed pregnancy termination with Prostin F2 alpha should be completed by some other means.

ADVERSE REACTIONS

The most frequent adverse reaction observed with the use of Prostin F2 alpha (dinoprost tromethamine) for abortion are related to its contractile effect to smooth muscle.

In the entire group of patients studied, approximately one-half experienced vomiting, one-quarter some nausea, and about one-fifth diarrhea. Other adverse effects, occurring from 2.7% to 0.1%, in decreasing order of frequency include:

Pain (other than uterine)
  Unspecified
  Epigastric
  Substernal, chest
  Leg
  Shoulder
Brachycardia
Headache
Flushing
Backache
Dizziness
Dyspnea
Posterior cervical perforations
Chills
Endometritis
Diaphoresis
Coughing
Hot flash
Wheezing
Convulsions
  Grand mal
  Possible epilitiform
Parathesia
  Unspecified
  of leg
Hypertension
Hyperventilation
Breast tenderness
Burning sensation
  In breast
  In eye
Chest constriction
Urine retention
Uterine rupture
Anxiety
Bronchospasm
Rales in chest
Diplopia
Drowsiness
Dysuria
Hematuria
Hiccough
Malaise
Polydipsia
Vasomotor symptoms
Vasovaginal symptoms
2nd degree heart block."

Under the "Precautions" section it also stated that "in patients with a history of asthma, glaucoma, hypertension, cardiovascular disease or past history of epilepsy, Prostin F2 aplha [sic] should be given with caution."

As noted earlier, evidence at trial indicated that cardiac arrest could have resulted from several of the side effects already listed in the package insert. Furthermore, it seems clear that the meaning and medical implications of several of the listed adverse reactions is outside the knowledge of the ordinary lay person. For this reason it was necessary to submit expert medical testimony to establish the inadequacy of the warning.

■ In light of the fact that plaintiff in this case failed to present expert testimony to establish the inadequacy of these warnings and,

moreover, that experts provided by Upjohn and others, *i.e.*, Dr. Gianopoulos and Dr. King, testified that the warnings provided in the 1978 package insert for Prostin adequately warned physicians of the known risks associated with the drug Prostin, we find that plaintiff failed to prove its case against Upjohn and that a directed verdict or judgment notwithstanding the verdict should have been granted to Upjohn.

■■■ We disagree with plaintiff's position that the Federal statutes and regulations established Upjohn's duty and its violation of that duty. The Federal statutes presented at trial and included in the jury instructions for consideration were not a substitute for expert testimony. The statutes merely set forth, in general, a drug manufacturer's duty under the law. However, to establish a violation of that duty, expert testimony was required to define the terms and explain the manner in which they were to be applied. A lay person would be unable to determine, for example, whether a drug was "misbranded" unless expert testimony was provided. Without expert testimony a decision would be conjecture. Furthermore, the typical juror would be unqualified to determine, without the aid of expert testimony, whether the failure to include "cardiac arrest" was a "material misrepresentation," as defined by the statute, which made the warnings false, misleading or inadequate to direct the drug's usage.

■■■ Based upon our decision to reverse the judgment against Upjohn, we find it unnecessary to address the other issues raised in Upjohn's appeal or plaintiff's cross-appeal, in which plaintiff argued that it was error for the trial court to have directed a verdict in Upjohn's favor on the issue of punitive damages. This court's finding that there was insufficient evidence to prove that Upjohn's failure to include cardiac arrest in the drug warning constituted a failure to warn would also preclude a finding that its failure to include cardiac arrest in the warning constituted wanton and willful misconduct. Therefore, we affirm the trial court's ruling on the punitive damages issue and now turn our attention to the appeals brought by Dr. Barton and IMMC.

DR. BARTON'S APPEAL

Although Dr. Barton raises a number of issues in his appeal, essentially, he questions the qualifications of the expert used by plaintiff to establish the applicable standard of care, the sufficiency of the evidence indicating that plaintiff's injury was proximately caused by his conduct, and a number of evidentiary rulings of the trial court which could have affected the damage award. We shall first address the issue concerning the expert testimony presented by plaintiff.

■■ ■ It is undisputed by the parties that, in a medical malpractice action, it is the plaintiff's duty to establish the proper standard of care to be applied to a defendant-doctor's conduct, a breach of that standard, and a resulting injury proximately caused by the breach of care. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) Additionally, unless the alleged negligence is so grossly apparent or within the common knowledge of a lay person, expert testimony is required to establish the standard of care and its breach. (*Novey v. Kishwaukee Community Health Services Center* (1988), 176 Ill. App. 3d 674, 531 N.E.2d 427.) When an expert is offered to establish the applicable standard of care and breach, a two-part test is used to determine the admissibility of the expert testimony. (*Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072.) First, it must be shown that the expert is licensed in the same "school of medicine" to which the defendant-doctor belongs. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13; *Witherell v. Weimer* (1986), 148 Ill. App. 3d 32, 499 N.E.2d 46.) Secondly, the expert must demonstrate that he is otherwise qualified to give expert testimony on the case.

■■ As stated in *Novey*, the "school of medicine" doctrine dictates that "the expert who establishes the practitioner's deviation from the pertinent standard of care must be both a licensed member of the school of medicine about which he opines and familiar with the ordinary methods, procedures, and treatments of the practitioners in the actual or similar community unless certain uniform standards apply regardless of either locality or available conditions or facilities." (*Novey*, 176 Ill. App. 3d at 678.) In this case, plaintiff's expert, Dr. Mathews, was licensed to practice medicine in the State of Illinois and employed as the director of emergency services at Northwestern Memorial Hospital. He testified that he was board certified in internal medicine and emergency medicine. It seems clear, therefore, that Dr. Mathews is licensed in the same "school of medicine" as Dr. Barton and that the first prong of the test for admission of expert testimony was satisfied.

However, it is the second prong of the test that presents problems for this court. Dr. Mathews testified that he was not an obstetrician or gynecologist and that his specialty was emergency medicine. Although he had testified as an expert in several cases, he stated that those cases involved the assessment and response to acute problems, such as would be seen in the emergency room. He had never worked in an obstetrical or gynecological ward, had attended patients delivering babies "on occasion," but apparently had never been involved in pregnancy-interruption procedures. He had never used the drug Prostin, had never seen it used and never observed the reactions of a patient re-

ceiving the drug. In fact, he had never had any experience with the drug in any manner and had not even read the insert and profile for the drug until he was asked to testify in the case. For these reasons this court finds that Dr. Mathews was not competent to testify on the standard of care to be applied to Dr. Barton.

We realize, as plaintiff argues, that Dr. Mathews' criticism of Dr. Barton centered around his assessment of his patient and not his administration of any gynecological procedure. However, Dr. Barton's assessment of his patient should not be taken out of context of the setting in which it was made since the issue is whether he deviated from the accepted or customary medical standards at the time and place that the event occurred. Dr. Mathews was not qualified to give an opinion on this since he could not know what was customary practice for someone in Dr. Barton's position.

As stated in *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53, to establish a *prima facie* case requires more than the mere presentation of testimony from another physician who would have acted differently. It requires testimony that the doctor deviated from established procedures. Dr. Mathews, whose experience was in the delivery of emergency care to acutely ill patients, may have reacted to the vital signs and symptoms of the plaintiff here in a distinctively different manner than the manner in which an obstetrician/gynecologist performing second-trimester pregnancy interruptions would have reacted.

Consequently, we find that the plaintiff failed to present sufficient expert testimony to establish the standard of care and the breach of that standard, and so we reverse the judgment entered against Dr. Barton.

ILLINOIS MASONIC MEDICAL CENTER

Initially, it should be noted that plaintiff's negligence action against IMMC was based on (1) the negligent conduct of Nurse Ping and (2) the medical malpractice of Dr. Barton, who was alleged to be an employee of the hospital. A general verdict was entered against all defendants and so it is impossible to distinguish on what basis the jury held IMMC responsible for plaintiff's injuries. Because of this and the fact that this court has already reversed the judgment against Dr. Barton, IMMC is entitled, at the very least, to a new trial. However, we must determine whether IMMC has presented any issues to this court which would warrant reversal of the judgment entered against it.

The determinative issue here is whether there was sufficient evidence presented at trial of the negligence of IMMC through its agent, Nurse Ping. IMMC claims that there was not. We agree.

In negligence actions of this type it is the plaintiff's duty to establish the standard of care that the hospital is required to meet, the deviation from that standard of care, and the manner in which the deviation resulted in harm to the plaintiff. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) The standard of care applicable to a hospital may be proven " 'via a number of evidentiary sources' " (*Mielke*, 124 Ill. App. 3d at 49, quoting *Greenberg v. Michael Reese Hospital* (1980), 83 Ill. 2d 282, 294, 415 N.E.2d 390), including expert testimony.

In this case plaintiff attempted to show, and the jury was instructed, that IMMC was negligent because: (1) its nursing personnel failed to obtain the presence of a physician from 4:40 to 4:55 p.m., and (2) its nursing personnel failed to "appreciate the existence of an emergency represented by the events described up to and including [Moran's] failure to improve with oxygen."

Plaintiff presented its expert, Dr. Mathews, to establish the standard of care and the deviation from that standard. However, a review of his testimony reveals that Dr. Mathews did not conclusively establish the applicable standard of care, nor did he establish Nurse Ping's deviation from that standard.

At trial plaintiff's attorney asked Dr. Mathews:

"Q. Doctor, based upon this record and the condition of the patient, do you— of what significance is it to you, if any, in formulating your opinions regarding Nurse Ping that a physician was not present until 4:55?"

Doctor Mathews responded:

"A. You know, if it was—let's—if it was 4:45, I wouldn't be concerned because I think that's a reasonable response for the nurse to what was done at 4:40.

It seemed to me, however, that that was—and it is my opinion, that that was one of the major parts of what her responsibility here.

I believe we discussed the two things I thought were critical actions here. One was to take some emergency steps to relieve this woman's problem, which was done in the form of, at least, some oxygen was started. And secondly, to contact a physician for help."

However, upon cross-examination, it was learned that Dr. Mathews had not read Nurse Ping's trial testimony and he was not able to de-

termine from the record what Moran's condition was between 4:45 and 4:55 p.m. In fact, he admitted that it was impossible to tell from the record when things actually happened because the record was not written simultaneously with the events, but rather was a retrospective account. For this reason it was difficult to determine at what point Moran's condition worsened to the point that intervention by a doctor should have been sought by Nurse Ping.

Dr. Mathews also testified that he would expect a nurse to use her past experience when exercising her judgment in deciding when an emergency existed and when it was necessary to call for a doctor or emergency assistance. Furthermore, he admitted that he was unfamiliar with the drug Prostin and the normal reactions to the drug which were typically observed by nurses and doctors working with the drug on a regular basis. For this reason, this court believes that Dr. Mathews was not qualified to establish and did not establish the standard of care that was applicable to Nurse Ping or her deviation from that standard.

By the same token, Dr. Gianopoulos, a practicing obstetrician and gynecologist, as well as a professor in obstetrics at Loyola University Medical Center, testified that when looking at the entire picture rather than isolated incidents, Nurse Ping acted appropriately and within the standard of care. The same opinion was expressed by Dr. King, an obstetrician and gynecologist who taught at Johns Hopkins School Of Medicine and had extensive experience with Prostin. He stated that, based upon his clinical experience with the drug Prostin, the signs and symptoms observed by Nurse Ping between the time of the instillation and the cardiac arrest were "characteristically thought of in that era of being transitory in nature." In fact all of the experts, even Dr. Mathews, admitted that cardiac arrest can occur without warning and without negligence on the part of the persons attending the patient.

Viewing all of the evidence, we conclude that the manifest weight of the evidence did not support the finding that Nurse Ping was negligent and so we reverse the judgment entered against IMMC.

For all the reasons stated above, the judgment entered in favor of the plaintiff and against the defendants is reversed.

Reversed.

GORDON and McNULTY, JJ., concur.