EMMA J. BENISON, Plaintiff-Appellant, v. LEONARD SILVERMAN, Defendant-Appellee.

First District (2nd Division) No. 1—90—3476

Opinion filed August 4, 1992.

690

Bickley & Bickley, of Chicago (John H. Bickley, Jr., of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Mark L. Karasik, Michael A. Pollard, and Mary K. McMahon Dudley, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Emma J. Benison appeals from the order of the circuit court granting summary judgment in favor of defendant Dr. Leonard Silverman in her medical malpractice case against him.

On September 11, 1984, Benison, who was in her early 70s, sought treatment from Dr. Silverman for an injury to her right foot, which she sustained five days earlier as a result of someone stepping on her foot during a trip to Washington, D.C. Dr. Silverman, who had treated Benison in the past for diabetes, congestive heart failure and anemia, stated that his examination of her right foot indicated that it was swollen and tender and that the fourth and fifth toes were painful and bruised. He also stated that he ordered X rays, advised her to avoid bearing weight on her foot, prescribed Tylenol, and asked her to come back the next morning for a blood test and the X-ray results. Benison claims, however, that Dr. Silverman reviewed the X rays with her on September 11 and told her it was only a bruise; she denies that he told her to come back the next day for a blood test and the X-ray results.

One week later, on September 17, 1984, Benison returned to Dr. Silverman, who reports that he reviewed her X rays with her, that the X rays were negative, but that she had soft tissue swelling, increased pain and bruising. In addition, by palpating the dorsal pedis, a pulse in the foot, Dr. Silverman concluded that the peripheral circulation of her fourth and fifth toes was compromised. Dr. Silverman noted that he urged Benison to be admitted to the hospital because of her diabetes and because he wanted her to be evaluated by a vascular surgeon. He claims Benison was upset, undecided and would let him know whether she was going to go to the hospital. However, Benison claims that Dr. Silverman only looked at her foot, but did not feel it, and that he told her to soak it in hot water and elevate it; she denies that he suggested she be hospitalized for the problem because of her history of diabetes or that he referred her to a vascular surgeon. Benison also denies that she told Dr. Silverman that she would consider his suggestion that she be hospitalized; she claims that he told her to return three days later. On September 20, 1984, Benison was

admitted to Little Company of Mary Hospital, where she was treated in the emergency room by Dr. Martin Phee, who diagnosed her as suffering from gaseous gangrene. Her right leg was subsequently amputated below the knee.

On March 7, 1985, Benison filed a complaint against Dr. Silverman to recover for personal injuries sustained as a result of his alleged malpractice. In an amended motion for summary judgment, Dr. Silverman argued that Benison had failed to comply with the court's May 4, 1989, order to disclose and present her experts and that she therefore had no expert testimony establishing that he had deviated from the standard of care. He argued further that neither Dr. Phee nor Dr. Perez-Sanz, her treating physicians, had been identified as experts. In any event, he asserted, neither one of them had reviewed his records or had given an opinion that he had deviated from the standard of care. Accordingly, Dr. Silverman claimed Benison could not establish the applicable standard of care or that he deviated from it, two requirements of a *prima facie* case of medical negligence, and therefore she had failed to present a factual basis that would entitle her to judgment on that theory. In support of his motion, Dr. Silverman submitted the affidavit of Dr. Schwer, in which Schwer, a family practitioner who had reviewed his records, stated that Silverman had not deviated from the applicable standard of care. In response, Benison argued that Dr. Phee established that Dr. Silverman's treatment did not meet the applicable standard of care. Dr. Silverman replied that Dr. Phee's answer to a hypothetical question was insufficient to create a question of fact as to whether Dr. Silverman deviated from the required standard of care.

On February 23, 1990, the circuit court granted Dr. Silverman's motion, and on November 2, 1990, it denied Benison's motion to reconsider, stating:

"Plaintiff must establish by expert testimony the standard of care by which defendant's conduct was to be measured; that the defendant was unskillful or negligent in light of such standard; and that his want of skill or care caused injury.

\* \* \*

As to Dr. Phee, he did not review the records of Dr. Silverman, he didn't read Dr. Silverman's deposition— \*\*\* and the gist of his testimony was that the care could have been more aggressive.

Now I do not believe that a statement that the care could have been more aggressive establishes a standard of care and a deviation from that standard, Counsel; it's as simple as that."

Benison appeals from the court's February 23, 1990, order granting summary judgment in favor of Dr. Silverman and from its November 2, 1990, order denying her motion to reconsider.

Our sole function in reviewing the trial court's granting of summary judgment is to determine whether it correctly ruled that there was no genuine issue of material fact. (*Blankenship v. Dialist International Corp.* (1991), 209 Ill. App. 3d 920, 923.) Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions on file present no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005.) However, summary judgment is not designed to try issues of fact, but rather, to identify whether they exist. (*Pyne v. Witmer* (1989), 129 Ill. 2d 351, 357-58; *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Moreover, it is well established that the pleadings, depositions, admissions, and affidavits in support of a motion for summary judgment are to be construed most strictly against the moving party and liberally in favor of the opponent. (*Pyne,* 129 Ill. 2d at 358; *Purtill,* 111 Ill. 2d at 240.) Although summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, because it is a drastic means of disposing of litigation it should be allowed only when the right of the moving party is clear and free from doubt. *Pyne,* 129 Ill. 2d at 358; *Purtill,* 111 Ill. 2d at 240.

 "The elements necessary to establish a negligence case for medical malpractice are the same as in other negligence actions. The plaintiff must prove that the medical professional owed him or her a duty, that the person failed to exercise the skill and care of a reasonable professional, and that damages were proximately caused by the breach of the standard of reasonable care. The crucial difference between medical malpractice and other negligence actions is the necessity of expert testimony to establish the standard of care and that its breach was the cause of plaintiff's injury." (M. Polelle & B. Ottley, Illinois Tort Law, 435-36 (1985); see also *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256.) "Generally, expert testimony is needed to support a charge of malpractice because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician." (*Walski,* 72 Ill. 2d at 256.) Although no expert testimony is necessary in situations in which the physician's conduct is so grossly negligent or the treatment is so common that a layman could readily appraise it, such as when sponges or instruments are left in the abdomen after surgery (*Walski,* 72 Ill. 2d at 256-57), because Benison sought the benefit of this exception for the first time at oral

argument before this court, we hold that she has waived her right to assert it. 134 Ill. 2d R. 341(e)(7).

■ Nevertheless, in support of her contention that the circuit court erred in granting summary judgment in favor of Dr. Silverman, Benison argues on the authority of *Beiermann v. Edwards* (1990), 193 Ill. App. 3d 968, *appeal denied* (1990), 132 Ill. 2d 543, that although she was barred from using expert testimony by virtue of her failure to comply with the disclosure requirement of Supreme Court Rule 220 (134 Ill. 2d R. 220), she did not have to disclose Dr. Phee as an expert under that rule because he was a treating physician.

In *Beiermann*, the defendant maintained that the trial court was correct in refusing to exclude the testimony of Dr. Traycoff under Rule 220 because he was not retained by the defendant for the purpose of rendering an opinion at trial. The court reasoned that "Rule 220 governs only those expert witnesses whose relationship with the party arose solely because a party retained the physician to render an opinion at trial; the physician's relationship to the case, not the substance of his testimony, qualifies him as a Rule 220 expert. (*Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 1093.)" (*Beiermann*, 193 Ill. App. 3d at 977.) Accordingly, the court found it evident that Dr. Traycoff was not hired to render an opinion at trial, and the fact that he gave his opinion of Beiermann's condition as having developed from his examination and diagnosis did not classify him as an expert. Relying on the authority of *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 234-35, the court held that although Dr. Traycoff did not treat Beiermann, his relationship with him more closely resembled that of a treating physician than that of a physician hired to give an opinion at trial. According to the court, Dr. Traycoff participated in the evaluation of Beiermann's condition, which was the subject matter of the trial. Further, he "testified only as to matters within his personal knowledge, and no hypothetical questions were posed to [him] by defense counsel." In addition, the court noted that Dr. Traycoff "was not under defendant's control but was called by defendant because [he] had formed an opinion while treating Beiermann which the defense apparently believed had value as evidence at trial." Accordingly, the court concluded that he was not a Rule 220 expert. *Beiermann*, 193 Ill. App. 3d at 977-78.

Although Dr. Silverman states that Benison's discussion of Rule 220 is irrelevant because the trial court fully considered Dr. Phee's testimony in ruling on his motion for summary judgment, he also claims that despite the fact that Dr. Phee, as a treating physician, could provide factual testimony as to the care that he rendered to the

plaintiff, he was not competent to offer any opinion testimony on the standard of care since he was never disclosed as an expert witness. In support of this argument Dr. Silverman relies on the authority of *Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 1017-19, *appeal denied* (1987), 113 Ill. 2d 573, *Atkins v. Thapedi* (1988), 166 Ill. App. 3d 471, 478, *appeal denied* (1988), 122 Ill. 2d 569, and *Sheahan v. Dexter* (1985), 136 Ill. App. 3d 241, 250, which indicate that treating physicians not previously disclosed as experts may not testify as to their opinions on the standard of care but they may testify as to factual matters of which they have knowledge. See also *Carter v. Dunlop* (1985), 138 Ill. App. 3d 58 (in which the court held that the plaintiff failed to prove a *prima facie* case of medical malpractice because of a lack of expert testimony despite the fact that she adopted a subsequent treating physician as her expert).

Supreme Court Rule 220 (134 Ill. 2d R. 220) provides in part:

"(a) Definitions.

(1) *Definition of expert witness.* An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor.

(2) *Consulting expert.* A consulting expert is a person who possesses the same qualifications as an expert witness and who has been retained or specially employed in anticipation of litigation or preparation for trial but who is not to be called at trial to render opinions within his area of expertise.

(b) Disclosure.

(1) *Expert witness.* Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:

(i) ascertain the identity of such witnesses, and

(ii) obtain from them the opinions upon which they may be requested to testify.

In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party ***. *** Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." 134 Ill. 2d R. 220.

Subsection (c) of the rule provides in part that a party retaining or employing an expert witness is required to state the subject matter upon which the expert is expected to testify, his conclusions and opinions and the bases therefor, his qualifications, and it also requires that the party in control of the witness supplement the expert's answers to interrogatories as additional information becomes known. (134 Ill. 2d R. 220(c).) In addition, subsection (d) of the rule provides in part that the expert's direct testimony at trial may not be inconsistent with or beyond the scope of the facts known or opinions disclosed in discovery. 134 Ill. 2d R. 220(d).

In *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, which was decided after *Greene, Atkins, Sheahan* and *Carter*, but before *Beiermann*, our supreme court held that a treating physician who will testify to medical opinions at trial is not an expert witness within the meaning of Supreme Court Rule 220(b)(1). According to the court:

> "Although the defendants argue that 'retained' in Rules 220(b)(1) and (c) refers broadly to witnesses who are 'requested' to give an opinion within their field of expertise, we consider it obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial. It may be said that the connection between a medical expert who is 'retained to render an opinion at trial' and the party to the suit may be litigation-related, rather than treatment-related. Treating physicians, on the other hand, typically are not 'retained to render an opinion at trial' but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from any litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a physician's observations while treating the patient, which coincidentally may have value as evidence at trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." *Tzystuck*, 124 Ill. 2d at 234-35.

The court found support for its decision in the committee comments to the rule, which indicated that the committee relied heavily

upon certain Federal Rules of Civil Procedure in drafting Rule 220. The court noted that the Federal decisions which have considered Rule 26(b)(4), the Federal counterpart to our Rule 220, have held that treating physicians are not within the scope of the rule because they acquire their facts and opinions, not in anticipation of trial, but as actors and viewers of the subject matter that gave rise to the litigation. Thus, found the court, Federal Rule 26(b)(4), like our Rule 220, does not require a party to disclose the identity or opinions of treating physicians who will testify at trial, but rather, under both rules, treating physicians are subject to the discovery provisions which apply to ordinary occurrence witnesses. *Tzystuck*, 124 Ill. 2d at 235-36.

Moreover, the court found that its decision was logical in light of the discovery obligations imposed by subsection (c) of the rule. According to the court, Rule 220(c) not unreasonably presumes that a litigant who retains an expert witness has control over and the cooperation of that witness. However, the court stated that a party generally does not have ready access to or control over treating physicians, who are involved in litigation only because they formed opinions while treating the patient which the litigant values as evidence at trial. Therefore, the court reasoned that to construe Rule 220 to include treating physicians would unfairly oblige litigants to ensure that witnesses beyond their control complied with the discovery obligations imposed by subsection (c) at the risk of having the witnesses disqualified for failure to comply. *Tzystuck*, 124 Ill. 2d at 237.

Further, in response to defendants' argument that the purpose of the rule was to eliminate the late or surprise disclosure of experts at trial, the court stated that there was no reason why a defendant should be surprised by the medical testimony of a treating physician at trial. According to the court, although treating physicians are not experts within the meaning of Rule 220, their identity is discoverable under Supreme Court Rule 201(b)(1) (107 Ill. 2d R. 201(b)(1)), which also requires parties to disclose the medical records of treating physicians so that opposing parties may discover the facts and data underlying the treating physicians' opinions. Moreover, the court noted that litigants may seek a court order under Supreme Court Rule 204 (107 Ill. 2d R. 204(c)) if they decide that it is necessary to depose a treating physician in order to prepare an adequate defense. *Tzystuck*, 124 Ill. 2d at 238; see also *Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171; *Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 941 (in which the court stated that "[t]here should be no surprise to an opponent when a treating physician testifies, even if that testimony is about matters that are within the scope

of his expertise, but beyond the scope of his own acts that were done in furtherance of the treatment").

According to the court in *Tzystuck*, the defendants had no ground to complain that they were surprised about the treating doctor's testimony because the plaintiff had disclosed the names of the treating physicians and informed the defendants that they would be testifying at trial. In addition, the defendants had the doctor's records and were allowed to depose him before he was called as a witness. The court stated further that the doctor relied on his own observations and experiences with plaintiff rather than on outside materials in forming the medical opinion which he gave at trial. *Tzystuck*, 124 Ill. 2d at 238.

Moreover, in *Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, the court held that a defendant physician who has not been disclosed as an expert witness pursuant to Supreme Court Rule 220 may be compelled to give testimony at a discovery deposition regarding the relevant standard of care. (*Fawcett*, 131 Ill. 2d at 383.) The court reasoned that the fact that the involvement of a treating physician in a case is treatment related rather than litigation related does not mean that defendant physicians may not render professional opinions at trial including opinions as to the standard of care. *Fawcett*, 131 Ill. 2d at 385; see also *Boatmen's National Bank v. Martin* (1992), 223 Ill. App. 3d 740, 741-42, *appeal granted* (1992), 145 Ill. 2d 631 (in which the court rejected the defendant's argument that a neurologist was not a treating physician because he expressed an opinion on the standard of care; the fact that the doctor formed opinions as to the cause of the patient's disability and the type of treatment she initially received did not transform him into a Rule 220 expert). But see *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 42, *appeal granted* (1992), 145 Ill. 2d 645 (in which the court held that the trial court erred in allowing an investigating officer, who had not been disclosed pursuant to Rule 220, to testify as an expert without prior disclosure because the questions posed to the officer clearly called for an opinion based on his expertise rather than on his observation of and involvement in a specific incident).

In light of these authorities, we find no impediment to Dr. Phee's testifying as to the standard of care notwithstanding the fact that he was not disclosed under Rule 220.

Nevertheless, Dr. Silverman contends that Dr. Phee, as an internist, was not competent to render an opinion on the applicable standard of care in family medicine, Silverman's area of practice. According to Dr. Silverman, Dr. Phee had no experience in family medicine,

and family medicine and internal medicine are two distinct fields with separate residency requirements and accreditation boards. In addition, he notes that his expert, Dr. Schwer, in contrast to Dr. Phee, practices family medicine and reviewed his records on Benison, and therefore is qualified to testify as to the standard of care.

In order to qualify, the "expert must be licensed to practice medicine in the defendant's school of medicine." (M. Polelle & B. Ottley, Illinois Tort Law 439 (1985); *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279.) According to Professors Polelle and Ottley, Illinois statutes recognize and regulate the following schools of medicine: dentistry, nursing, optometry, pharmacy, physical therapy, podiatry, psychology and a school for physicians. (M. Polelle & B. Ottley, Illinois Tort Law 439 n.50 (1985).) "Once it is established that the witness is licensed to practice within the same school, it is up to the court to determine whether that person has sufficient education, training, and experience to qualify as an expert regarding the standard of care." M. Polelle & B. Ottley, Illinois Tort Law 439 (1985).

Dr. Silverman relies on the authority of *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, *cert. denied* (1992), 502 U.S. 1095, 117 L. Ed. 2d 418, 112 S. Ct. 1172, and *Thomas v. University of Chicago Lying-In Hospital* (1991), 221 Ill. App. 3d 919, in support of his position that Dr. Phee does not meet the second prong of the test. In *Northern Trust*, the court held that an emergency medicine specialist was not qualified to testify as to the standard of care required of an obstetrician or gynecologist in a medical malpractice case involving a patient who suffered a cardiac arrest and a brain injury during an abortion. Although the emergency medicine specialist had testified as an expert in several cases, those cases involved the assessment and response to acute problems as would be seen in an emergency room. In addition, although he had on occasion attended infant deliveries, he had never worked in an obstetrical or gynecological ward, had apparently never been involved in pregnancy-interruption procedures, and had never had any experience with the drug Prostin, which had been administered to the patient. Consequently, the court concluded, the emergency medicine specialist was not qualified to give an opinion because he could not know what the customary practice was for someone in the defendant doctor's position. *Northern Trust Co.*, 213 Ill. App. 3d at 406.

Similarly, in *Thomas*, the court held that a pediatrician was not qualified to testify on the standard of care to be applied in a case against an obstetrician/gynecologist because the pediatrician was not board certified in either obstetrics or gynecology, had never practiced

in either obstetrics or gynecology except during medical school, and because her job during delivery was to attend to the baby and not the mother. Most important, the court stated, was the fact that the pediatrician had never treated postpartum bleeding, the medical problem at issue in the case. *Thomas*, 221 Ill. App. 3d at 925.

■ However, as Benison points out, internal medicine is more specialized than family medicine. According to Polelle and Ottley, "a specialist's testimony can establish the standard of care against a general practitioner." (M. Polelle & B. Ottley, Illinois Tort Law 439 (1985), citing *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 654.) In light of the facts in this case, we conclude that Dr. Phee was sufficiently qualified to testify as to the standard of care.

Therefore, we address Benison's contention that the circuit court erred in granting summary judgment in favor of Dr. Silverman because, as she states, "[t]he deposition testimony of Dr. Phee unequivocally established a *prima facie* case of medical malpractice on the part of Dr. Silverman." The relevant portions of Dr. Phee's deposition testimony are summarized below.

When asked if he had an opinion to a reasonable degree of medical certainty as to whether the care rendered to Benison, from the time she was injured in Washington until the time he saw her at the hospital on September 20, 1984, was in accord with acceptable standards, Dr. Phee answered, "I think the care could have been a little bit more aggressive." He was then asked whether his opinion would change assuming that on September 17, 1984, three days before he saw her on September 20, 1984, she was seen by her doctor and was told that she needed to go to the hospital. He answered that it would not. Dr. Phee was also asked how long he thought the foot, before he saw it, had been necrotic. Based on his experience, he thought it had been necrotic from four to seven days. He later changed his answer to four days. When asked what he meant by more aggressive treatment, Dr. Phee explained that the immediate institution of antibiotics and the debridement of the toes and all the things that were done at the hospital were more aggressive.

In addition, Dr. Phee was also asked a lengthy hypothetical question in which he was asked to assume that a 71-year-old woman had been treated by a doctor in Cook County, Illinois, in 1983 and 1984 for a diabetic condition, that the woman told the doctor she wanted to attend a convention in Washington, D.C., and that before she left, the doctor, as a result of his examination of her, took her off her medication. He was also to assume that on September 6, 1984, while she

was away, someone stepped on her foot, that a dull pain began the next day, and that cool water was applied to the foot the day after that. In addition, Dr. Phee was to assume that on the third day after the accident, the foot began to hurt when she walked on it; that on the fourth day after the accident, the pain became sharp, and that she went to see the doctor on September 11, 1984, the fifth day after it was injured. He was to assume further that the doctor sent her to the hospital for an X ray, showed her the X ray, told her that her foot was not broken, prescribed no medication, told her to go home and keep it elevated, and to come back one week later on September 17, 1984. Dr. Phee was to also to assume that on September 17, 1984, when she returned, the pain and swelling in the foot had increased, that the doctor told her to go home, soak her foot in hot water, and elevate it. He was to further assume that the pain became so great that on September 20, 1984, she went to the emergency room, was diagnosed as suffering from gaseous gangrene, was immediately hospitalized and her foot was subsequently amputated. On the basis of these assumed facts, Dr. Phee was asked whether the doctor's conduct was below the standard of care and conduct required of doctors in Cook County and the State of Illinois in the area of internal medicine. Based on his experience, Dr. Phee answered that it did not meet the standard of care. On the basis of the same facts, Dr. Phee was also asked the minimal amount of time it would have taken for the foot to develop the condition it was in at the emergency room. He answered that it would take four days.

Dr. Phee was then asked whether it was his opinion, to a reasonable degree of medical certainty, that, in order to get into the condition it was in when he saw it at the emergency room, the condition had to have manifested itself at least four days prior to that time. He answered yes. He was then asked whether, if he had seen her on September 17, 1984, he would have ordered hospitalization. He answered that a doctor doesn't order hospitalization, but rather asks the patients to go to the hospital or makes arrangements for them to go.

When asked whether it was correct that he did not know what treatments were rendered to Benison from the time she was in Washington until September 20, 1984, Dr. Phee answered yes. He also answered in the affirmative when asked whether it was correct that he was not taking a position on the treatment rendered to Benison, but that he rendered an opinion based on a hypothetical situation.

Dr. Silverman contends that Benison "never established the applicable standard of care in family medicine or any acts through which [he] deviated from it." He argues that Dr. Phee's statement that the

treatment "could have been a little bit more aggressive" was insufficient because it did not establish a deviation from the standard of care, but merely a difference in medical judgment which is consistent with the exercise of due care. *Walski*, 72 Ill. 2d at 261; see also *Stevens v. Sadiq* (1988), 176 Ill. App. 3d 333, 338-39; *Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 523-24; *Buck v. Alton Memorial Hospital* (1980), 86 Ill. App. 3d 347, 354; *Smith v. Menet* (1988), 175 Ill. App. 3d 714, 717-19, *appeal denied* (1989), 124 Ill. 2d 562.

Dr. Silverman argues further on the authority of *Carter v. Dunlop* (1985), 138 Ill. App. 3d 58, 70, that Benison cannot establish a deviation from the standard of care through the testimony of Dr. Phee, because Dr. Phee never reviewed his records and therefore has no knowledge of the treatment he rendered to her, and because Dr. Phee stated that he had no opinion on the quality of his treatment of Benison. According to Dr. Silverman, the court in *Carter* found that oral information provided by the patient did not provide a sufficient foundation upon which to render an opinion on the standard of care, and that without reviewing the defendant's medical records, the subsequent treater's opinion was not based on any facts or data of a type reasonably relied upon by experts in the particular field.

In *Carter*, the plaintiff alleged that Dr. Dunlop failed to prescribe proper and sufficient doses of medication and to provide an adequate course of treatment. Dr. Dunlop denied the allegations and responded that the plaintiff's injury was caused by her own negligence in failing to take her medication. In reviewing the depositions of Dr. Dunlop and that of the subsequent treating physician Dr. Schimel, the court found that there was no genuine issue of material fact as to the standard of care because both doctors' depositions showed that treatment of an overactive thyroid with Tapazole for approximately six months is an appropriate course. *Carter*, 138 Ill. App. 3d at 68.

Nevertheless, the plaintiff contended that there was a genuine issue of material fact as to whether she did in fact take the medication. According to the court, that issue was material to the question of proximate cause, an integral part of the plaintiff's burden of proving the existence of a cognizable cause of action. Dr. Schimel testified that he could not criticize the course of treatment administered by Dr. Dunlop, but could only conclude that as presented to him the patient was not adequately treated for hyperthyroidism. However, the plaintiff argued that despite the fact that she had not taken the medication, Dr. Schimel was critical of the unmonitored and unsupervised manner in which he perceived Dr. Dunlop had administered the prescriptions. The court noted that the basis of Dr.

Schimel's perception was not in the record and that he did not review Dr. Dunlop's records. It appeared to the court that Dr. Schimel's perception of the plaintiff's therapy was not based on facts or data of a type reasonably relied upon by experts in the particular field in forming opinions. *Carter*, 138 Ill. App. 3d at 68-70.

The court reasoned:

> "We agree with defendant that it would be fundamentally unfair to permit the plaintiff to, in effect, manufacture a claimed issue of fact by relying on the deposition testimony of an expert whose opinion was based solely on information provided to him by the plaintiff, where that information contradicted in a material aspect the information supplied to the defendant doctor by plaintiff and upon which information his treatment of her was based. In order to successfully oppose defendant's summary judgment motion, it was incumbent upon plaintiff to introduce some factual support for a conclusion that defendant might be liable to her by countering defendant's allegation in his answer that it was her own failure to take the medication as prescribed that was the proximate cause of her injury. [Citation.] Plaintiff's offer of Doctor Schimel's deposition testimony, based on what she told him and with no review of the records of defendant's actual course of treatment, was insufficient to counter defendant's deposition in support of his motion for summary judgment." *Carter*, 138 Ill. App. 3d at 70.

According to Dr. Silverman, the same lack of foundation appears in this case. In addition, he emphasizes that the hypothetical question posed to Dr. Phee was "riddled with errors" and that Benison's account of the events contradicted Dr. Silverman's records on several crucial points. He further notes that proof of a poor result is not evidence of a lack of skill. *Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, 960; *Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 679, *aff'd* (1975), 60 Ill. 2d 418.

However, Benison claims that this case is distinguishable from *Carter* because Dr. Phee's opinion was based on his past experience, firsthand knowledge of the case and the facts assumed in the hypothetical question which were similar to her account of the facts in this case. Benison relies on the authority of *Wilson v. Clark* (1981), 84 Ill. 2d 186, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, in support of her position that this is an acceptable basis upon which to render an expert opinion.

In *Wilson,* our supreme court approved of the rationale embodied in Federal Rule of Evidence 703, which states:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

According to the court in *Wilson,* Rule 703 makes no distinction between treating and nontreating experts. (*Wilson,* 84 Ill. 2d at 193.) Further, as Benison points out, the key element in applying the rule is whether the information upon which the expert bases his opinion is reliable. *Wilson,* 84 Ill. 2d at 193; see also *Mazur v. Lutheran General Hospital* (1986), 143 Ill. App. 3d 528, 534.

■ As explained by the court in *Wilson* (84 Ill. 2d at 193), according to the committee's note to the rule, there are three sources of facts or data upon which expert opinions may be based: (1) firsthand observation of the witness such as that of a treating physician, (2) presentation of data at trial such as through the technique of a hypothetical question, and (3) presentation of data to the expert outside of court and other than by his own perception. Regarding the third type of data, the committee's note states that a physician in his own practice bases his diagnosis on information from numerous and varied sources including statements made by patients and relatives, reports and opinions from nurses, technicians and other doctors, and from hospital records and X rays. *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 1097, *appeal denied* (1989), 124 Ill. 2d 554.

In *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, the court held that the trial court erred in refusing to admit the evidence deposition of a nontreating expert whose opinion was based in part upon the plaintiff's subjective statements. The court reasoned that the acceptance of the opinion was a question for the finder of fact, and that the fact that the data upon which the opinion was based came from an interested litigant was relevant only to the weight to be given the opinion and not to its admissibility. *Melecosky,* 115 Ill. 2d at 216.

We note further that "[t]he purpose of the hypothetical question is to provide either party with the opportunity to explore the expert's opinion with respect to assumptions of fact that are based on the evidence either directly or by circumstantial evidence. [Citation.] 'Where the testimony is conflicting, counsel is entitled to base

such questions on the testimony supporting his own theory of the case and any contrary testimony may be called to the attention of the expert witness on cross-examination by varying the hypothesis.' [Citation.]" *Kane v. Northwest Special Recreation Association* (1987), 155 Ill. App. 3d 624, 629.

■ Nevertheless, a "plaintiff must show, through expert testimony, the standard of care applicable to the defendant physician and the failure of defendant to conform to the standard." (*Weekly v. Solomon* (1987), 156 Ill. App. 3d 1011, 1014, *appeal denied* (1987), 117 Ill. 2d 555.) We hold that Dr. Phee's testimony did not establish the relevant standard of care applicable to Dr. Silverman. Dr. Phee was first asked whether the care rendered to the plaintiff was in accordance with acceptable standards. However, those standards were never defined. Although Benison claims that any doctor, regardless of his area of practice, can recognize gangrene, Dr. Phee's testimony did not establish that there was some type of minimum or uniform standard applicable to all doctors regardless of their area of practice in cases of gangrene. Further, although Dr. Phee stated that the treatment rendered in the hypothetical question was below the standard of care, the question asked whether the treatment was below the standard of care and conduct required of doctors in Cook County in the area of internal medicine, not family medicine. While, as previously noted, a specialist's testimony may establish a standard of care against a general practitioner, a specialist cannot hold a general practitioner to the standard of a specialist. *Stogsdill*, 35 Ill. App. 3d at 654.

Therefore, for all of the above-stated reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.