HELEN THOMAS, Plaintiff-Appellant, v. UNIVERSITY OF CHICAGO LYING-IN HOSPITAL *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—90—2713

Opinion filed November 12, 1991.

Malek & Wein, P.C., of Chicago (Grace E. Wein, of counsel), for appellant.

Cassiday, Schade & Gloor, of Chicago (Timothy J. Ashe and Lynn D. Dowd, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Helen Thomas, appeals from an order of the circuit court, which directed a verdict for defendant Dr. Bruce Pielet at the close of Thomas' case in chief during the parties' medical malpractice trial. Thomas also appeals from the court's judgment entered upon the jury's verdict in favor of defendant University of Chicago Lying-In Hospital. The issues presented for review are whether the circuit court committed reversible error by directing the verdict and whether the jury's verdict in favor of the hospital was against the manifest weight of the evidence. We affirm, for reasons which follow.

On August 10, 1984, Thomas filed a two-count complaint, sounding in medical malpractice against defendants, which alleged that the hospital discharged Thomas in unsatisfactory condition following the birth of twins. She further charged that Dr. Pielet gave her improper medication when she returned to the hospital for the treatment of post-delivery bleeding.

At trial, Thomas testified that she entered the hospital on June 14, 1983, and delivered twins in the early morning of June 15. At the time of the delivery, several "interns" were present, but no one assisted her in the birth of the second twin. After the second twin was born, those present "pressed" out the afterbirth. Thomas remained in the hospital for two days during which time she experienced nothing unusual.

Thomas returned to the university clinic in the evening of June 27 because she was bleeding heavily from her vagina. According to Thomas, she had lost about one-half to three-quarters of a cup of blood since 2:30 that afternoon. Dr. Pielet examined her and found no evidence of bleeding. Pielet gave Thomas a prescription, but did not tell her to return to the clinic if the bleeding continued. For the next three days, Thomas experienced mild cramping and continued bleeding. She did not return to the clinic because Pielet had told her to take all the medicine until it was finished. By June 30, Thomas experienced heavy blood loss, which necessitated her return to the clinic. When Thomas arrived at the clinic, she was semi-conscious and very weak. After receiving fluids, Thomas suffered a collapsed lung, and doctors needed a venous catheter to restore her breathing. Doctors then told Thomas that she required a dilatation and curettage (D & C). After that procedure was performed, Thomas' condition improved.

Dr. Pielet testified as an adverse witness. On June 27, 1983, Thomas came into the university clinic where Pielet was on duty and told him that she had been bleeding since 2:30 that afternoon. Pielet examined her and found only an old blood clot in the vaginal cavity, with no sign of active bleeding. Thomas did not complain of fever, chills, cramping or abdominal pain, and all of her vital signs were normal. Her uterus size was consistent with that of a patient who was 12 days postpartum. Pielet also performed a hematocrit, which revealed that Thomas' red blood cell count also was within normal range for Thomas' post-delivery condition. Pielet did not perform a manual inspection of the uterus because Thomas' cervix was not dilated. Pielet prescribed medication and told Thomas that she might experience additional bleeding. He informed her that she would have to return to the hospital immediately if the bleeding resumed.

Dr. Anita Stewart testified as Thomas' expert. Stewart is a board-certified pediatrician, but is not certified in either obstetrics or gynecology. Stewart is the medical director at the New City Health Center and also works as a consultant for the Illinois Department of Public Aid, where she, with a panel of other doctors, reviews the care received by aid recipients. Stewart reviewed all of Thomas' records and found that, in her medical opinion, Thomas did not receive the appropriate care. Based on Stewart's review of the delivery room chart, Stewart stated that it appeared that Thomas was "checked" only by a medical student. Stewart stated the standard of care dictates that the placenta be inspected only by a licensed physician and not by a medical student since a licensed physician can better detect signs of complications. Moreover, Stewart asserted that the incidence of retained placental fragments is greater with twins; therefore, the standard of care is heightened. This heightened standard requires the delivery physician to "feel inside the uterus," checking to ensure that it is smooth and that no fragments remain. Since the manual exploration was not performed in Thomas' case, Stewart believed Thomas received substandard care from the hospital staff during her delivery.

Stewart identified further deviations from the standard of care which occurred on Thomas' June 27 visit to the clinic. According to Stewart, Pielet should have reviewed the pathology report and should have manually inspected the uterus. A complete blood count (CBC) should have been ordered as opposed to the hematocrit which was performed. Stewart stated that the CBC would have been more inclusive and reliable. Finally, Pielet should have told Thomas to return to the hospital if bleeding resumed.

On cross-examination, Stewart admitted that retained placental tissue can occur even where no negligence occurs. A patient can suffer from placental retainage, and doctors reasonably may be unable to diagnose the condition. Furthermore, missing placental fragments sometimes are not visible. Stewart believes that post-delivery manual exploration should be done in all cases. However, retained placental fragments can still remain undetected even if manual uterine exploration is performed. The pathology report on the placenta revealed that it appeared to be complete although several lacerations were discovered. Stewart admitted that Thomas' delivery record was signed by Dr. Herbst, the delivering physician, and that Pielet's record of Thomas' June 27 visit contained instructions for Thomas to return if bleeding, fever, or chills occurred.

At the close of plaintiff's case, defendants moved for directed verdicts. The circuit court granted the motion as to Dr. Pielet, but denied the motion as to the hospital.

Dr. David Zbaraz, a board-certified obstetrician/gynecologist, testified as the hospital's expert witness. He reviewed Thomas' records and found that the care she had received was both appropriate and within the accepted standards. Zbaraz explained that, in 3% of all deliveries, the succenturiate lobe of the placenta is not expelled during the afterbirth. However, it is very difficult to ascertain if the lobe is missing when the placenta is visually examined. According to Zbaraz, a physician has to perform a D & C after delivery in order to determine definitively if the lobe was expelled. Such a procedure, however, would subject the patient to more risks than benefits. Furthermore, the retainage can escape detection if the patient does not experience any post-delivery fever, chills, unusual uterine tenderness and excessive bleeding. In Thomas' case, her hospital records indicated that the delivery physician, Dr. Herbst, checked the placenta. Moreover, the placenta also was sent to the pathology department for a test which later revealed that the placenta, although lacerated, was intact. Based on these facts, Zbaraz did not find any evidence of negligence on the part of the delivery team.

Zbaraz disagreed with Dr. Stewart's opinion that a manual exploration of the uterus should be done after all deliveries. He stated that such a procedure should only be done on occasion. In Thomas' case, a manual exploration would have been against the standard of care because Thomas was not anesthetized and had been in the delivery room for over two hours, thereby increasing the risk for contamination and infection. Since both the visual and pathological inspections had revealed an intact placenta, a manual exploration would have been unnecessary.

The videotaped evidence deposition of Dr. Arthur Herbst also was shown to the jury. After Thomas was admitted on June 14, Herbst, chairman of the obstetrics and gynecology department at the university, performed an ultrasound to verify that Thomas was carrying twins. The fetuses' vital signs were monitored, as were Thomas' contractions. Herbst delivered Thomas' twins on the morning in question. Herbst swore that he was present in the delivery room throughout both births and that he had inspected the placenta.

The jury returned a verdict in favor of the hospital upon which the circuit court entered judgment.

Thomas argues that the circuit court erroneously directed the verdict in favor of Dr. Pielet, constituting reversible error. She contends

that a question of fact existed which precluded the grant of a directed verdict. Defendants urge affirmance of the circuit court's judgment due to Dr. Stewart's lack of expertise in the areas of obstetrics and gynecology.

On a motion for directed verdict, the role of the circuit court is to view the evidence in a light most favorable to the nonmovant and decide whether a verdict for the nonmovant could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) In properly directing a verdict, the court determines as a matter of law that there are no evidentiary facts out of which the jury may construct the necessary fact essential to recovery. (*Blacconeri v. Aguayo* (1985), 132 Ill. App. 3d 984, 992, 478 N.E.2d 546.) The circuit court's ruling will not be reversed unless it is contrary to the manifest weight of the evidence.

In a negligence medical malpractice case, the burden is on the plaintiff to prove the essential elements of the cause of action: the proper standard of care against which the defendant's conduct is measured, an unskilled or negligent failure to comply with the applicable standard, and a resulting injury proximately caused by the physician's want of skill or care. (*Purtill v. Hess* (1986), 111 Ill. App. 3d 229, 242, 489 N.E.2d 867.) Moreover, unless the alleged negligence is so grossly apparent or within the common knowledge of a lay person, expert testimony is required to establish the standard of care and its breach. (*Novey v. Kishwaukee Community Health Services Center* (1988), 176 Ill. App. 3d 674, 531 N.E.2d 427.) When an expert is offered to establish the applicable standard of care and breach, Illinois courts employ a two-part test to determine the admissibility of the expert testimony. (*Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072.) The proponent must show that the expert is licensed in the same "school of medicine" to which the defendant doctor belongs (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13), and the expert must demonstrate that she is otherwise qualified to give expert testimony on the case.

The "school of medicine" doctrine dictates that "the expert who establishes the practitioner's deviation from the pertinent standard of care must be both a licensed member of the school of medicine about which he opines and familiar with the ordinary methods, procedures and treatments of practitioners in the actual or a similar community unless certain uniform standards apply regardless of either locality or available conditions and facilities." (*Novey,* 176 Ill. App. 3d at 678.) In this case, Thomas' expert, Dr. Stewart, was licensed to practice medicine in the State of Illinois and was employed as the

medical director of the New City Health Center and as a consultant for the Department of Public Aid. Clearly, Dr. Stewart is licensed in the same "school of medicine" as Dr. Pielet, and the first prong of the test for admission of expert testimony was satisfied.

However, defendants assert that Dr. Stewart failed to meet the second prong of the test, citing *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 572 N.E.2d 1030. There, the appellate court held that the plaintiff failed to provide sufficient expert testimony when a doctor specializing in emergency medical care rendered opinions as to obstetrics and gynecology. Although the expert's criticism centered around the defendant's assessment of the patient and not his administration of any gynecological procedure, the court stressed that the defendant's "assessment of his patient should not be taken out of context of the setting in which it was made since the issue is whether he deviated from the accepted or customary medical standards at the time and place that the event occurred." *Northern Trust*, 213 Ill. App. 3d at 407.

■ At bar, Dr. Stewart testified that, at the Department of Public Aid, she renders opinions as to standards of medical care received by aid recipients in conjunction with a peer review panel composed of doctors from various specialty fields. Stewart is not board certified in either obstetrics or gynecology, and her specialty is pediatrics. Stewart stated that, during a delivery, her job as a pediatrician was to care for the baby after birth. She would not render any care to the mother because that was the obstetrician's duty. Stewart had never practiced in either gynecology or obstetrics except during medical school. More importantly, Stewart had never treated postpartum bleeding, which was the medical problem at issue here. For these reasons, she was not competent to testify on the standard of care to be applied to Dr. Pielet.

■ In order to establish a *prima facie* case, a plaintiff must introduce more than the mere presentation of testimony from another physician who would have acted differently. (*Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53.) Plaintiff is required to present evidence to show that the doctor deviated from established procedures. Here, Dr. Stewart, whose experience was in pediatrics, may have reacted to Thomas' symptoms in a distinctively different manner from the manner in which an obstetrician/gynecologist would have reacted.

■ Although a question of fact was raised with regard to Pielet's instructions to Thomas, the entry of the directed verdict was not error since Thomas failed to establish a *prima facie* case of negligent

medical malpractice due to her failure to present sufficient expert testimony setting forth the standard of care and the breach of that standard. The circuit court did not err in directing the verdict.

Thomas also claims that the jury's verdict in favor of the hospital was against the manifest weight of the evidence.

Based on the reasoning set forth above, the verdict rendered at bar was not against the manifest weight of the evidence. Since Thomas failed to establish a *prima facie* case due to her failure to present sufficient expert testimony, any verdict other than the one returned here could not stand. The circuit court's judgment, therefore, will not be disturbed.

For the foregoing reasons, the order and judgment of the circuit court are affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.